UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Dharma P. Agrawal, | : | Case No. 1:10-cv-766 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| University of Cincinnati, et al, | : | |
| | : | |
| Defendants. | : | |

**ORDER**

Before the Court is the motion for summary judgment filed by Defendants John

Bryan and Carlo Montemagno.  (Doc. 84)  Plaintiff opposes the motion (Doc. 90), and

Defendants have filed a reply.  (Doc.  96).

Plaintiff is a tenured Professor at the University of Cincinnati College of

Engineering.  Defendant Carlo Montemagno was the Dean of that College, and John

Bryan was the Vice Provost of the University, during the salient events giving rise to

Plaintiff's complaint.  Plaintiff generally alleges that both of the Defendants violated his

constitutional rights and discriminated against him on the basis of his national origin

and/or race.  His original complaint was filed in state court and included a breach of

contract claim against the University.  Defendants removed the case and filed a motion

to dismiss, which this Court granted in part.  (See Doc. 13)  The federal claims against

the University were dismissed with prejudice, and the state law breach of contract claim

was dismissed for lack of federal jurisdiction.

Plaintiff's remaining claims in this case are brought against Defendants

Montemagno and Bryan under 42 U.S.C. §§1981 and 1983, and seek damages against

both Defendants in their individual capacities. In addition to his discrimination claims, Plaintiff contends that Defendants violated his procedural and substantive due process rights. Defendants seek summary judgment on all of Plaintiff's claims, and alternatively contend that they are entitled to qualified immunity.

For the following reasons, the Court will grant Defendants' motion.

## FACTUAL BACKGROUND

Professor Dharma Agrawal is a tenured member of the Computer Science Department in the UC College of Engineering.[1] Dr. Agrawal is of Indian descent; he became a faculty member at the University in 1998, when he accepted UC's offer to become the Ohio Board of Regents Distinguished Professor of Computer Science and Computer Engineering. In the mid-1990's, the Board of Regents had earmarked funds to be awarded for the purpose of enhancing state universities' computer science Ph.D. programs, including the University of Cincinnati's program. Dr. Agrawal was hired to foster and encourage the creation of "an interdepartmental center for distributed computing." (Agrawal Ex. J at 1) He testified that "the overall objective was to create a research environment in a given concentration area so that a lot more activities of Ohio could be visible throughout the country[,] creating more Ph.D. graduates from Ohio universities." (Agrawal Dep. at 132-33) The interdepartmental center was intended to be a physical presence on campus, initially supported with OBR funds, and a place that would encourage cooperative efforts among various faculty members to foster the goals

---

[1] The names of Dr. Agrawal's department and College have changed several times over the years. The Court will use these titles throughout this Order for ease of reference.

of the Regents' initiative. (Id. at 135-137) OBR funding was not a permanent commitment, as the goal was to develop a center that was ultimately self-sustaining. (Carter Dep. at 18) Dr. Agrawal's initial offer from UC provided that he "will have spending discretion over the OBR Computer Science Ph.D. enhancement funds and discretion with consultation with other faculty over UC approved matching funds." (Agrawal Ex. J at 1)

Harold Carter was a tenured Professor in the College of Engineering until he retired in 2008. He was the chair of the Electrical Engineering Department beginning in April 2004, and was involved in initially obtaining the OBR funds. Carter testified that the computer engineering faculty initially welcomed Dr. Agrawal due to his distinguished background and prior academic career, but that the welcome waned after a few years. Carter described some problems with Dr. Agrawal's funding proposals that were not well written and were rejected. He also said that a disproportionate amount of available funding was being allocated solely to Dr. Agrawal and not shared with other faculty projects. (Carter Dep. at 57-60) As early as the spring of 2000, the Dean and other UC officials were addressing the fact that Dr. Agrawal's salary would need to be paid from UC general funds if and when the OBR funding ceased. Dr. Agrawal was aware of these concerns. (Agrawal Dep. at 163-64, and Exs. P and R) In March 2002, the then-Dean of Engineering denied Dr. Agrawal's request to use OBR funds to pay for his own extra compensation, concluding it would be improper to use those funds for that purpose. (Agrawal Ex. Q)

The Dean of Engineering resigned sometime in 2005; after a search, the University hired Carlo Montemagno, whose term began July 1, 2006. On May 16, 2006,

Harold Carter sent Dr. Agrawal a letter informing him that his discretionary authority over the use of OBR funds was being reduced.  The letter stated that the change was being implemented to provide all faculty with access to the incentive funds.  Carter noted that while the original intent of the OBR funds was for Dr. Agrawal to

> ... create and manage a research center, external funding to support such a center has failed to materialize.  Thus, rather than create a research center involving other faculty, I recommend your research activities center upon creating and managing your own laboratory. ...  As you acquire increasing research funding through sources external to the department and university, the support funds you now receive from the OBR CS Investment fund should be diverted instead to enhancing the research activities of the rest of the CS/CompE faculty in the department.

(Carter Ex. 6)  Carter testified that he began reviewing Dr. Agrawal's use of OBR funds when he became the department head in 2004, and that he expressed concerns to Dr. Agrawal about his management of those funds and the large number of graduate students that he intended to support.  (Carter Dep. at 84-88)  Carter said that his May 2006 letter was intended to foster an "attitudinal change" in Dr. Agrawal, that is, "to not depend on OBR funding for his own research but to, over a three-year period, move to obtain funding outside the OBR to lighten the load on the OBR funds," and to make them more available to other faculty.  (Carter Dep. at 133-134)  Dr. Agrawal alleges that Montemagno instigated this decision to reduce Dr. Agrawal's access to OBR funds even before Montemagno arrived on campus, and argues it was the start of a "determined and deliberate effort" by Montemagno (later joined by Bryan) to destroy Dr. Agrawal's research career.  (Doc. 90 at 3)

After Montemagno's term began, he made other changes at the College.  In

September 2006, he decided to create separate departments for Computer Science and Electrical Computer Engineering, which had previously been one larger department. Montemagno believed that the reorganization would reduce the time spent on "internal disagreements" and would improve faculty scholarship, resulting in a better student environment.  (Montemagno Dep. at 75-76)  Carter testified that the computer science professors and the electrical computer engineers were "... like Republicans and Democrats, like conservatives and liberals.  However you want to classify them, they just saw the world differently in terms of their professional activities."  Carter had assumed the position as department chair in hopes of bringing the two groups together, but admitted that he "was never successful."  (Carter Dep. at 72-73)

In October 2006, while Dr. Agrawal was on sabbatical at Carnegie Mellon University, Montemagno moved Dr. Agrawal's office furniture and furnishings from his office to another office and moved into the space himself, without notice to Dr. Agrawal. (Doc. 90, Ex. 28, Agrawal Aff. at ¶ 5)  That same month, Montemagno decided to accelerate the transfer of the OBR funds (which Carter's May 2006 letter had stated would occur over a three-year period) and immediately transferred those funds from Dr. Agrawal's discretionary control to Carter and Paul (the computer science and electrical engineering department heads).  Carter and Paul then sent a memo to Dr. Agrawal on October 20, 2006, stating that effective January 1, 2007, the funds would be used to "support more broad-based computing initiatives" in both departments.  The letter also stated that commitments to Dr. Agrawal's currently funded research students (who were identified in the memo) would be maintained through June 2007, and that Dr. Agrawal's own salary and benefits would continue to be paid by the OBR funds.  (Montemagno

Ex. 4a)  Montemagno said that when he became Dean, the College was facing a significant financial crisis due to an impending budget cut of $600,000 to $900,000, and he was expected to take steps to address this crisis.  (Montemagno Dep. at 134-135) He also testified that the OBR funds were going to expire within three years, and he disagreed with Carter's decision to phase out Dr. Agrawal's discretion over a three-year span: "So my position was that, we know these funds are going away.  We have a short period of time where we're going to have those funds.  If we wait for three years, they are no longer going to be available, and we are not going to be able to leverage them to lift up the rest of the faculty."  (Id. at 106)

Dr. Agrawal alleges that Montemagno purposefully discriminated against him because Montemagno "waited" to announce his decision until Dr. Agrawal had left campus for his sabbatical.  Dr. Agrawal objected in writing to Montemagno, pointing out that his original appointment letter stated that he would have discretion over the use those funds.  (Agrawal Ex. BB)

Dr. Agrawal is a member of UC's AAUP bargaining unit and subject to the grievance procedures in the collective bargaining agreement between the University and the AAUP.  Article 8 of the CBA describes a multi-step procedure for resolving faculty members' grievances.  The procedure encourages informal resolution at the outset; if that is unsuccessful, the procedure concludes with a final and binding decision of an appointed Grievance Panel composed of non-involved faculty members.  Dr. Agrawal filed a grievance and sought mediation about Montemagno's transfer of the OBR funds, and his decision to split the Electrical and Computer Engineering department from the Computer Science department.  (Agrawal Ex. DD)  The informal

mediation was not successful, and Dr. Agrawal submitted a formal Grievance Form on March 28, 2007. (Agrawal Ex. FF) Dr. Agrawal withdrew this grievance because he concluded that the CBA procedure was not the proper forum in which to resolve his objections about the OBR funds; instead, he later filed a breach of contract lawsuit in state court. (Doc. 90 at 11, n.53)

Dr. Agrawal had planned to spend approximately $50,000 of the OBR funds in 2006-2007 for the salary of Dr. Yoo, a post-doctoral fellow. Yoo left that position sometime in the spring of 2006, and Bin Xie, a recent doctoral graduate at the University of Louisville, arrived in Cincinnati. Xie was not recruited by UC or by Dr. Agrawal, but Dr. Agrawal said that he knew Xie and knew that Xie hoped to work with him. Dr. Agrawal wanted to hire Xie to fill Yoo's post-doctoral slot effective June 1, 2006, and said that Carter knew of and approved his appointment. Carter admitted that he knew of Dr. Agrawal's plan, but testified that Dr. Agrawal did not need his approval because Dr. Agrawal still had control over the OBR funds at that time. (Carter Dep. at 114.) On September 1, 2006, Dr. Agrawal sent an email to Jerry Paul (who had just been appointed as the interim head of Dr. Agrawal's department), asking Paul to "release" Xie's appointment,

> ... which has been pending since June 1, 2006 and was approved by Dr. Hal Carter (it is with our new Dean). It is hard to wait anymore and the person has been working in my absence without any salary for 3 months now. The Dean said, he will wait for the Interim Head to be appointed and now that it done, it is now time to release that. I am strictly following the guidelines established by Hal [Carter] in terms of spending limits.

(Carter Ex. 8) Jerry Paul testified that he "assumed" Dr. Agrawal's request would have gone to the College's business manager; for reasons that are not entirely clear from the

record, the request was not processed.  But the ultimate result was that Xie began work in Dr. Agrawal's program in late May 2006 but was not paid until sometime in November 2006.

In 2007, the University's Office of Sponsored Research Services (SRS) implemented new and more stringent rules concerning its role in the submission of faculty grant proposals to outside funding sources.  SRS generally oversees the grant process for all UC faculty, and is specifically charged with obtaining appropriate internal approvals and ensuring compliance with state regulations.  Beginning in early 2007, Deborah Galloway and other SRS staff made a series of formal presentations to groups of faculty about the new rules, and particularly one requiring faculty members to submit their applications to SRS five days prior to the submission deadlines imposed by funding agencies.  (Galloway Dep. at 138-139; Degen Dep. at 43-45, 48)  Dr. Agrawal attended one of the SRS presentations.  He disagreed with some of the new rules, and he criticizes the 5-day deadline because it put too much pressure on him.  He also accuses SRS of discriminating against him because SRS could not finish processing one of his proposals in five days, but was able to complete another faculty member's proposal in one day; that faculty member was a Caucasian woman.  (Agrawal Dep. at 227-231)

In the spring quarter of 2007, Montemagno reduced the amount of Dr. Agrawal's student laboratory space.  And in August 2008, UC Provost Anthony Perzigian wrote to Assistant Professor (and Agrawal protégé) Quing-An Zeng, notifying Zeng that his non-tenured appointment would not be renewed effective with the term ending August 31, 2009.  Dr. Agrawal contends that both of these actions were also part of Montemagno's

plan to "ruin" his research program.[2]

Bin Xie's Complaint

On July 10, 2008 (after he left UC), Xie sent a lengthy letter to the University

Provost's office to complain that he had not been paid by Dr. Agrawal, and accusing Dr.

Agrawal of "self-plagiarism" and inappropriately using his students on Dr. Agrawal's

SBIR grants.  At the end of his letter, Xie asked the University to investigate his

allegations, and to protect the students he identified as witnesses to some of the

incidents he described.  (Agrawal Ex. QQ)  Jane Strasser, the Vice President for

Research Compliance, testified that Sandra Degen (Vice President of Research), Karen

Faaborg (Vice Provost) and Montemagno each received certified letters from Xie.

(Strasser Dep. at 17)  On July 25, 2008, Montemagno sent a letter to Dr. Agrawal,

stating that he was initiating an Article 9 disciplinary proceeding under the CBA, based

upon information that Agrawal may have improperly used foreign students holding F-1

---

[2] Documents attached to Agrawal's response brief show that Zeng was offered a position beginning September 1, 2003 for three years, subject to reappointment depending upon performance.  The first three years were a probationary period, with notification of renewal to be provided by August 31, 2005.  On August 19, 2005, Zeng was reappointed with the Dean's approval but without the recommendation of his department head or his department.  In August 2007, Perzigian reappointed Zeng for one year rather than two, because a shorter period would allow for additional feedback. While Zeng was commended for good teaching, Perzigian and the Dean concurred that he had to elevate the quality of his publications.  "A very significant concern is that you have not shown evidence of the ability to attract, as [Principal Researcher], research funding to support your work and your graduate students.  It is imperative that you show success in this regard prior to a consideration of promotion and tenure."  On August 7, 2008, Perzigian wrote Zeng that he would not be reappointed per the Dean's recommendation, because of "a lack of evidence of the impact of your work on technology development, engineering practice, or scientific progress as indicated by the inability to attract funds for your research."  (Doc. 90, Ex. 12)  Carter believed that Zeng's ability to manage other graduate students was "weak."  (Carter Dep. at 88, 101)

visas to help write grants for his private company, Global Information Solutions. (Agrawal Ex. RR)

Article 9 of the CBA sets out a multi-step process governing the resolution of accusations of faculty misconduct.  That process begins with a meeting between an appropriate university official and the faculty member to discuss the charges to try to informally and mutually resolve them.  Failing that, a written statement of the formal charges must be sent to the faculty member; any disciplinary measures must be proposed within 60 days of the faculty member's notice of an investigation.  No disciplinary action may be taken before the faculty member's right to a formal Grievance Panel hearing has either expired or been waived.  The procedures for convening and conducting a panel hearing mirror the Article 8 process, beginning with outside mediation and ending in a final and binding panel decision.

The required initial meeting took place between Dr. Agrawal, Montemagno, and Karen Faaborg (UC's Vice Provost at the time) on August 14, 2008.  Montemagno testified that in addition to the Article 9 charges, they discussed issues concerning Dr. Agrawal's submission of grant proposals to funding agencies prior to SRS review and approval.  According to Montemagno, Dr. Agrawal said that working within the SRS guidelines was a "waste of time," and he decided to ignore them.  Montemagno believed this conduct could expose the University to potential liability.  (Montemagno Dep. at 177-178)  The parties could not reach an informal resolution, and on October 3, 2008, Montemagno formally notified Dr. Agrawal of alleged misconduct to be addressed in the Article 9 proceeding:

> 1. You have not gone through the appropriate Sponsored

-10-

Research Services channels to submit proposals for your research; rather you have submitted them through your private company.

2. In using students to work on these proposals you have exploited them for your personal gain with no commitment to benefit them.

3. In the case of your post-doctoral employee Bin Xie, you have permitted him to begin working for you before you secured the funding for his position.  As a result, Dr. Xie was not paid for six months of the time he worked for you. Dr. Xie is owed $24,000 for his work, and the college will provide that amount to him immediately, and will hold you responsible for repaying it.

4. Five additional international graduate students on F-l visas who did not have training (OPT) permits were assigned by you to work on proposals for your company.

5. You have rarely reported the work you do for your private company on the outside activity report that is required of all employees annually and that must be resubmitted whenever new commitments or potential conflicts arise.

6. You have never submitted a conflict management plan to the university to disclose the relationship between your research for the University and your research for your own company, or to make it possible to determine ownership in any intellectual property involved.

(Montemagno Ex. 10)  Montemagno proposed that the following disciplinary actions be taken against Dr. Agrawal: suspension for one quarter with his salary maintained; a deduction of $24,000 from his salary to reimburse the College for the payment it made to Xie; a change in Dr. Agrawal's title from OBR Distinguished Professor to Professor of Computer Science; and assignment of the same workload as other professors with such titles. (During the subsequent Grievance Panel hearing, Montemagno withdrew the recommendation with respect to changing Dr. Agrawal's title.  See Doc. 79-1 at 58.)

Dr. Agrawal sought outside mediation of Montemagno's proposed discipline, and a series of sessions were facilitated by a mediator (Jerry Lawson).  When a mediated resolution could not be achieved,  Dr. Agrawal formally requested a hearing before a Grievance Panel.  Dr. Agrawal and the College submitted written position statements to the Panel prior to the April 10, 2009 formal hearing, at which both parties were represented by legal counsel.  (Doc. 79-1, Transcript of April 10, 2009 Hearing) Witnesses at the April 10, 2009 hearing included Dr. Agrawal, Montemagno, Harold Carter, Jerry Paul, and two of Dr. Agrawal's students who had helped write grant proposals.  Much of the questioning at the hearing dealt with the circumstances surrounding Bin Xie, whom Dr. Agrawal admitted had started work in his laboratory sometime in May 2006.  Dr. Agrawal explained that he initiated paperwork to get approval for Xie's salary in early June, because Dr. Agrawal thought that Xie's interactions with Dr. Agrawal's other students was good.  The following exchange then took place:

> Dr. Agrawal: Let me make one point clear at this point.  When you're asking Bin Xie salary - he worked for 18 month, and he got paid for 18 month.  He did not work from December 2007 to May 2008.  He was not there in Cincinnati during that period.  And as a - as a gesture of goodwill, I let him pay that money.
>
> Dr. Lipton: So if I'm to understand you, you knew that he wasn't working during that time, but you allowed the university ... to continue to pay him as if he was there .. During that time –
>
> Dr. Agrawal: Yes.  I'm sorry.
>
> Dr. Lipton: - as a method of compensation -
>
> Dr. Agrawal:  Yes, sir.
>
> Dr. Lipton: - for the uncovered time?

Dr. Agrawal: Yes, sir.

Dr. Lipton: All right.  Do you understand the implications of doing that?

Dr. Agrawal: I know.

(Doc. 79-1 at 97-98)

Later on, Dr. Agrawal explained that he secured grant funding for Xie's position

beginning on November 1, 2006, but not for the period from May through November 1:

Panel Member: Was that, then, subsequently addressed in an ongoing fashion or that was -

Dr. Agrawal: There was no way to pay backward ... from my grant.

Panel Member: But what about through other channels?  Did you continue to pursue how he was going to be reimbursed for the work he had already done?

Dr. Agrawal: The only other channel was the OBR money, and that was already closed by the dean.

Dr. Lipton: Okay.  And then you came up with the solution that he - where [Xie] went back to China in November of 2007.  And you said, you can go for six months and that will cover you, and we'll continue to pay you?

Dr. Agrawal: Right.

Dr. Lipton: And you said that would substitute for his pay from May to November of 2006?

Dr. Agrawal: Yes.

Dr. Lipton: And that's your contention?

Dr. Agrawal: Right.

...

Panel Member: My question, then, is the charge that's being made against you by the respondent that [Xie] was not paid for six months of time that he worked for you, and your answer, or your solution was that in - and, again, in agreement with Dr. Xie that he could leave for six months to go

-13-

back to China, and that's how you were able to recover those six months that didn't get paid initially?

Dr. Agrawal: That's right.

Dr. Lipton: So during those six months you did not work with him at all, he was not working?

Dr. Agrawal: He was not working.

(Id. at 118-119)   Several questions later, the issue arose again:

Dr. Lipton: And the funding during the six months was from the STTR [grant]?

Dr. Agrawal: Yes.

Dr. Lipton: Okay.  So he was not working on the project associated with the STTR during those six months?

Dr. Agrawal: Yes.

Dr. Lipton: Okay.  You understand that that's using federal money to do - and saying that he's working on a federal project that he's not working on?

Dr. Agrawal: I understand that, yes, sir. ...

Dr. Lipton: Well, I understand why you were doing it, I'm just saying you understand ... the problem of doing that -

Dr. Agrawal: Yes, sir.

Dr. Lipton: - and the level of - of scrutiny that the federal government could bring down for doing that knowingly? ...

(Id. at 120-121)

Following the hearing, the grievance panel issued a written decision on May 9, 2009.  (Agrawal Ex. AAA)   That decision states:  (1) The panel unanimously agreed that Dr. Agrawal consistently and knowingly failed to obtain SRS approval in advance for his grant proposals in violation of UC policy, as he had readily admitted during the hearing.

-14-

(2) They unanimously concluded that Dr. Agrawal did not exploit students for personal gain with no commitment to benefit the students, based on the questions posed to Dr. Agrawal and two of his students who appeared at the hearing.

(3) They agreed that Dr. Bin Xie was owed $24,000 for the period May-November 2006.  They further agreed that Dr. Agrawal had no right to promise Bin Xie a position without securing prior approval, but they also agreed that the administration was knowledgeable and complicit in this episode.  They rejected Montemagno's proposal to extract funds from Dr. Agrawal's personal salary to compensate Xie, finding that no faculty member should be held personally liable, including Dr. Agrawal, Carter, Paul, or Montemagno.  On this subject the panel further concluded:

> Additional troubling information regarding Dr. Xie's compensation came to light during the hearing.  Professor Agrawal contended that while Dr. Xie was employed at UC and paid exclusively from an STTR grant, he had spent 6 months in China, and was therefore not owed any compensation for the 6 months of missing compensation prior to November 2006.  Professor Agrawal fully admitted his knowledge of paying an employee from federal funds and certifying Labor Verification Statements when the employee was not working.  This activity was not part of the charges or the proposed discipline.  However, the panel unanimously agrees that this is a serious breach of federal guidelines that the university should fully investigate this finding and propose appropriate remediation and disclosure to the appropriate federal agency.

(Agrawal Ex. AAA at 5)

(4) The panel unanimously agreed that students on F-1 visas did not violate their visas by working on Dr. Agrawal's grant proposals.

(5) They unanimously agreed that Professor Agrawal historically failed to file his Outside Activity Reports, but that he had recently been more compliant.  The evidence

also indicated that general faculty compliance prior to 2007 was relatively low, demonstrating "historically poor oversight by the university."

(6) They concluded that because there was no evidence of a conflict between Dr. Agrawal's private company and the university, he had not failed to file a conflict management plan.

The panel also found that the College administration did not follow appropriate progressive discipline procedures to address what the panel described as "Agrawal's pattern of poor student supervision," and skirting university rules for his own convenience.  But they found that increasing a faculty member's teaching load should not be used as a punitive action.  The panel concluded that a letter of reprimand outlining the offenses that had been established by the evidence should be placed in Dr. Agrawal's file, including a warning that any new violations would be met "with the severest consequences at the discretion of the administration."  Id. at 6.  They also recommended that the engineering administration develop a mandatory training plan for Dr. Agrawal, which would permit him to share the information with other engineering faculty members.  In its conclusion, the panel noted that the College's investigation of the charges that began with Xie's letter was incomplete because critical witnesses had not been interviewed.[3]  They found that Dr. Agrawal was wrong to permit Xie to begin work without a firm funding commitment, but also found that situation arose "as an epiphenomenon of a leadership vacuum during 2006 in the College of Engineering."  Id.

---

[3] The hearing transcript shows that the panel unsuccessfully tried to reach Xie by telephone during the hearing in order to obtain his testimony.  (Doc. 79-1 at 203-204, 262-264)

at 6-7.  Ultimately, none of Montemagno's proposed disciplinary measures were actually imposed upon Dr. Agrawal.

Xie's accusation of self-plagiarism against Dr. Agrawal was separately investigated by Jane Strasser and Melissa Colbert, who both work in the University's Research Compliance group.  They essentially concluded that Dr. Agrawal had improperly replicated some of his own previously published work in a subsequent professional publication, but that the issue was not worth further pursuit by UC based on the type of publication that was involved.  So far as Strasser knew, that publication did not take any action about the issue.

The Second Article 9 Investigation

Prior to the May 2009 final panel decision, Montemagno and John Bryan (who had recently assumed the post of Interim Vice Provost following Karen Faaborg's appointment as the University's Chief Human Resources Officer) began an investigation into Dr. Agrawal's testimony that he paid Xie for approximately six months that Xie was not actually working on his grant.  Bryan approached the UC General Counsel's office, and they subsequently contacted Christine Ackerman, UC's Director of Internal Audit. Ackerman testified that she did not open a formal investigation immediately because she believed that Bryan was conducting one.  In August 2009, however, Ackerman was informed by UC's Office of Government Cost Compliance that Dr. Agrawal had shifted the payment of two student stipends from one grant to a second grant; the co-principal investigator of the second grant, Mingming Lu, refused to sign labor verification statements for those students because they were not working on that grant.  (Ackerman Ex. 3 at 2)  Ackerman's office then began a formal investigation of all grants for which

Dr. Agrawal was either the principal or co-principal investigator, given "the serious nature of the circumstances that have already occurred ... as well as the fact that this occurred more than once, thereby indicating a pattern of behavior."  Id.

On August 12, 2009, Montemagno notified Dr. Agrawal that he was initiating an Article 9 investigation concerning these issues.  (Agrawal Ex. CCC)  Dr. Agrawal responded on August 31, protesting that he signed the labor verification statements, and that the issues about Xie had been aired and resolved by the first grievance panel's decision.  He also objected to that hearing panel's report, stating that he had admitted paying Xie for time he was not working; he said that issue was not part of the formal charges considered by the first grievance panel, and so he did not "respond" to the report at that time.  He strenuously objected to a second disciplinary investigation, complaining that he had already incurred attorney's fees and suffered great emotional distress.  (Agrawal Ex. FFF)  Notwithstanding Dr. Agrawal's objections, Ackerman continued her office's investigation into Dr. Agrawal's grants; she obtained documents from the Office of Government Cost Compliance and interviewed a sample of Dr. Agrawal's students.  She looked at documents that Xie had given to Bryan, and she interviewed Mingming Lu.  Bryan continued his own investigation into the grants and the proper accounting for Xie's salary.  Bryan met with several faculty members on August 25, 2009, including Galloway, Sandra Sanders from the Cost Compliance office, and Associate Dean for Financial Affairs Schraffenberger.  Bryan was concerned that UC had exposure to a federal investigation or possible loss of federal funding due to Dr. Agrawal's testimony concerning Xie, and his reported refusal to sign proper labor verification statements.  Frank Gerner, Associate Dean of the College of Engineering,

testified that he was very concerned about the verification statements because, without a properly certified statement, UC would have to either recoup the funds or reimburse the government; he believed that Dr. Agrawal's failure to properly certify labor statements ultimately cost UC almost $100,000.  (Gerner Dep. at 110)

Bryan personally interviewed Xie in Louisville, Kentucky on August 27, 2009.  Xie showed him documents reflecting the fact that Xie returned from China in January 2008 and worked for Dr. Agrawal until May 2008, which contradicted Dr. Agrawal's hearing testimony.  Bryan believed that Xie's documents also confirmed that his actual work effort was not entirely related to the grant from which Dr. Agrawal reported paying him at that time.  While Xie explained that he was working on some of Dr. Agrawal's grants, Bryan was concerned that Dr. Agrawal had not signed proper labor certifications attesting to Xie's specific work on any specific grant.

At some point, Dr. Agrawal did sign a labor verification statement for Xie for the fourth quarter of FY 2008 (April-June 2008), stating that Xie's work was 100% related to a Systran Air Force grant.  Dr. Agrawal crossed out the printed words on the form that stated "wages charged are reasonable in relation to the work performed during the period indicated above."  He wrote in the words, "He did not perform as he was not here in Cincinnati."  Dr. Agrawal did not date this form.  (Agrawal Ex. NNN, at CM/ECF PAGEID #3972)  Bryan believes that Dr. Agrawal signed this form after his April 10, 2009 hearing testimony because he did not want to contradict his testimony about Xie's whereabouts during this time.  (Bryan Dep. at 94)

At this point, despite continuing doubts about whether Xie's work had been properly reported, Montemagno decided not to pursue any Article 9 discipline against

Dr. Agrawal regarding Xie.  (Bryan Dep. at 95; Montemagno Dep. at 204)  However, based on the information he had obtained, Bryan decided to impose temporary restrictions on Dr. Agrawal with respect to his grants pending the outcome of the second Article 9 proceeding and the audit investigation.  These restrictions were set forth in an August 28, 2009 letter to Dr. Agrawal, and were based on what Bryan described as the University's forced decision to replace the grant funds used to pay Xie with local funds "in order to preclude any possibility of institutional complicity in the fraudulent use of federal funds."  Id.  The restrictions were:

1. The University will cancel your Purchasing Card(s).

2. The University will not approve University-funded or grant-funded travel for you.

3. The University will not approve your receiving extra compensation from any grant.

4. The University will not approve your submission of new grant proposals as a Principal Investigator or Co-Principal Investigator.

5. The University will not approve your awarding graduate assistantships to any student unless existing grant funds are available to support those students' stipends and/or scholarships.

6. The University will not assign any additional graduate students to you as your advisees.

7. The University will not approve your hiring undergraduate students unless existing grant funds are available to support those students' pay.

8. The University will not approve further expenditures on the InfoScitex Mesh Express Phase II-FEO grant.

9. The University may, at its discretion, suspend any or all grants on which you are currently a PI or your activities on any grants on which you are Co-PI.

(Bryan Ex. 11)

Dr. Agrawal filed a formal grievance objecting to these restrictions on September 4, 2009.  On October 27, he wrote to Bryan to demand that the restrictions be lifted because the 60-day period provided by Article 9 had expired without a notice of proposed discipline.  A few days later, he sought permission to attend a pre-proposal meeting with the Air Force; that request was granted but Bryan refused to lift the restrictions until the Internal Audit of Dr. Agrawal's grants was completed.  The parties then began mediation on the grant restrictions.  In December 2009, with the mediator's assistance, Dr. Agrawal agreed to accept four grant-related controls, Bryan agreed that Dr. Agrawal could submit an NSF grant, and the parties agreed to continue mediation efforts in January.  The four agreed-upon controls were:  (1) Dr. Agrawal must inform his students about the scope of work associated with every grant on which the students worked; (2) he must inform his students of how their duties coincide with the grant's scope of work; (3) his students must keep and sign time sheets on which they describe the work that they do by the hour (aggregated across a day) and certify that the work that they do is directly associated with the grant to which that time is being charged; and (4) Dr. Agrawal must sign the students' time sheets and the resulting labor verification statements, certifying that the students did the work described and that such work was in furtherance of the grant.  (Agrawal Ex. KKK)

The outside mediator closed the mediation in February 2010 because the parties could not reach a global resolution.  Dr. Agrawal then requested a grievance panel hearing.  He submitted his written position statement a few days later, and was interviewed by Ackerman and Bryan on March 16, 2010.  Dr. Agrawal admitted that his first hearing testimony was erroneous, and that Xie had in fact worked for him in the first

half of 2008.  But he told Ackerman that he would "have to think about" signing new

labor verification statements to properly document Xie's work, and permit UC to recoup

the costs that had been transferred from Dr. Agrawal's federal grant to UC internal

funds.  (Ackerman Ex. 1 at 9)

The final Internal Audit Report was released on May 10, 2010.  (Ackerman Ex. 1)

The Executive Summary states:

> In general, we recommend the additional internal controls put in place by
> Dr. John Bryan in an email dated December 15, 2009[4] be made
> permanent. ...  The university relies upon individual faculty members to
> understand the principles and processes of accurate effort reporting.  At a
> minimum, this means that each faculty member must have personal
> knowledge of the amount and nature of the work that students under their
> supervision are performing, and that the faculty member review, complete,
> sign and submit Labor Verification Statements (LVS) for personnel under
> his or her supervision by published deadlines.  The results of the audit
> demonstrate that Dr. Agrawal has not fulfilled these responsibilities and
> that, at best, the methods used by him to account for and verify effort are
> unreliable. ...
>
> In light of the above, the permanent adoption of the additional internal
> controls imposed by Dr. Bryan would appear prudent.
>
> We believe that Bin Xie did work for the university during the period
> December 2007-June 2008 and that Dr. Agrawal's original grievance
> hearing testimony given in April 2009 was inaccurate.  Therefore, we
> believe that Dr. Agrawal should certify accurate LVS forms for Bin Xie for
> that period, which may enable the university to pay a portion of Bin Xie's
> salary from Dr. Agrawal's grants ...
>
> We also believe that the university may be able to obtain sufficient
> documentation to support paying the salary of two students amounting to
> $9,308 from grant #1006451 ...  The university removed salary of $9,308
> for two students ... from grant #1006451 ... because the PI on the award,
> Mingming Lu, refused to certify two LVS for two of Dr. Agrawal's students
> (Dr. Agrawal is the Co-PI on this award).

---

[4] These were the four restrictions to which Dr. Agrawal agreed during the
mediation effort.

-22-

Id. at 3-4.  In the section of the report addressing the situation concerning Xie, the report concluded that "Dr. Agrawal has demonstrated that he cannot be relied upon to accurately accomplish these tasks [of proper effort reporting and supervising students]; therefore, the additional internal controls imposed by Vice Provost Dr. John Bryan appear to be a prudent permanent control measure for the university to take."  (Id. at 9)

The report also reviewed Dr. Agrawal's payments for "intersession" or extra compensation from grant funds from July 2007 through June 2009.  The auditor concluded: "One could infer that Dr. Agrawal does not understand the university's intersession compensation policy, especially the policy that the work he certifies actually has to take place during the period certified.  The university should consider implementing additional internal controls over the intersession compensation Dr. Agrawal could apply for in the future."  (Id. at 11) The report recommended that Dr. Agrawal should be trained about proper effort reporting because he regularly submitted LVS forms that were either late or were not dated.  And it noted some concerns about whether Dr. Agrawal had actually implemented the four steps he had agreed to in December 2009, because his responses to questions about the actual steps he was taking to monitor his students' time and the work they performed were inconsistent and (according to the auditors) were not entirely credible.  The report recommended that the business office should ensure that those controls were implemented and utilized.  (Id. at 12)

The second Article 9 grievance panel held its hearing on May 17, 2010; the witnesses included Ackerman, Deborah Galloway (from Sponsored Research), Montemagno, Bryan, and Dr. Agrawal.  (Doc. 79-2)  The panel's June 11, 2010 written

decision unanimously found:

> 1.  The internal controls on effort reporting imposed in December 2009 are necessary measures of sound fiscal administration that do not in any way violate Article 9 and should be made permanent.

> 2.  As a result the nine university restrictions imposed in August 2009 are redundant of college authority and should be discontinued until any forthcoming Article 9 proceeding establishes a basis for discipline.

(Montemagno Ex. 27 at 1)  With respect to the four agreed-upon internal controls, the panel found they were "fully warranted administrative measures imposed to satisfy the university's fiscal responsibilities.  The grievant failed to demonstrate that those controls constitute discipline that improperly single out Dr. Agrawal in violation of Article 9's due process requirements."  (Id. at 3)  The panel found that the original nine restrictions contained in Bryan's August 2009 letter to Dr. Agrawal were largely redundant because the university has extensive authority to place restrictions on all faculty members on a case by case basis.  Two of the restrictions (#5 and #7, requiring existing grant funds to be available for hiring any graduate or undergraduate assistants) apply to all faculty; #1 (restricting the purchasing card) and #9 (UC's discretion to suspend grants) did not impose any unique limitation on Dr. Agrawal that was not true of other faculty members. Restriction #8 was moot because that grant was closed.  The panel then addressed the remaining four restrictions; they concluded that restriction #2 (no grant funded travel) and #3 (ban on extra compensation) should be discontinued because UC must pre-approve both travel and extra compensation for all faculty.  Restriction #4 regarding new grant proposals appeared to be moot because Dr. Agrawal submitted an NSF proposal in December 2009, and the University conceded that he could submit others if he fully complied with the four agreed controls.  Moreover, the College must pre-approve all

grant proposals so there was no need for the blanket restriction.  Restriction #6 (no new graduate students assigned) was no longer needed "unless imposed after a future Article 9 disciplinary proceeding," because the college had full authority under standard policy to assign advisors to all graduate students.  The panel found no evidence that Dr. Agrawal was abusing his students, as the administration had argued in a rebuttal statement.  The report concluded that based upon Dr. Agrawal's "improper effort reporting, the respondents had good reason to distrust Dr. Agrawal and to restrict student related grant activity."  (Id. at 5)

Computer Science 2010 Merit Pay

Dr. Agrawal alleges that Montemagno denied him a merit pay increase in 2010, another adverse employment action that he contends was based on his national origin and his race.

Pertinent facts concerning this issue are set forth in Montemagno's affidavit. (Doc. 84, Ex. 4)  Article 10.3 of the CBA for the period 2010 through 2013 provided for merit pay increases for bargaining unit members, based on faculty performance during the period September 1, 2008 to December 30, 2009.  (Id. at Ex. 1)  This was the first time that merit pay was made available under the CBA since Montemagno came to UC in 2006.  Article 10.3 established a pool of funds equal to one-half of one percent of the total salaries of bargaining unit faculty.  The Dean of each College had discretion to award merit increases disproportionately, based upon an assessment of the faculty member's teaching, research and service.  A "Superior" performance rating would be awarded a 1% increase, and an "Excellent" rating would receive a 0.5% increase. Faculty rated as "Other" would receive no increase.

Professor Prabir Bhattacharya (of Indian descent) was appointed the Chairman of the Computer Science Department in September 2009.  Bhattacharya completed his recommendations to the Dean for his faculty's merit raises, ranking Berman, Purdy and Annexstein as "Superior" and ranking Agrawal, Schlipf and Bhatnagar as "Excellent" (which would entitle all of them to merit increases).  Montemagno rejected those recommendations because he believed that every faculty member should not receive a merit increase, and that faculty members' current salaries should be considered when awarding any increases.  Dr. Agrawal's salary was roughly $70,000 higher than all other Computer Science faculty members.  Montemagno appointed two Associate Deans to review and revise the recommendations.  Annexstein, Schlipf, Bhattacharya, and Bhatnagar each received 0.5% based on reassessed "Excellent" ratings.  Professors Berman, Purdy and Agrawal were given "Other" ratings and received no pay increase. Annexstein, Schlipf, Berman and Purdy are Caucasian; Bhatnagar, Bhattacharya and Dr. Agrawal are of Indian descent.

Dr. Agrawal alleges that Montemagno's merit pay revisions and the denial of a raise to Dr. Agrawal were also part of Montemagno's series of attacks on Professor Bhattacharya.  These "attacks" included Montemagno's decisions to "gut" the Computer Science faculty, to block new hiring in the department, to terminate the undergraduate computer science program (a decision that was later reversed by UC), and eventually the removal of Professor Bhattacharya as head of the department.  Dr. Agrawal suggests that this conduct is further evidence of Montemagno's discriminatory animus

towards Indians.[5]

## ANALYSIS

I.    Standard of Review

The court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be

supported by citations to particular parts of the record, including depositions, affidavits,

admissions, and interrogatory answers.  The party opposing a properly supported

summary judgment motion "'may not rest upon the mere allegations or denials of his

pleading, but ... must set forth specific facts showing that there is a genuine issue for

trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation

omitted).

The Court is not duty bound to search the entire record in an effort to establish a

lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir.

1992).  Rather, the burden is on the non-moving party to "present affirmative evidence

to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford

& Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in

dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts."  Matsushita

Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court

---

[5] Professor Bhattacharya did not agree that Montemagno's conduct was motivated by discriminatory animus, despite numerous suggestions to that effect from Dr. Agrawal's counsel.  See Bhattacharya Dep. at 119-127.

construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

II.    Section 1981

Defendants contend that claims for money damages against individual defendants are not cognizable under 42 U.S.C. §1981.  While claims for prospective or injunctive relief may be prosecuted under that section, Dr. Agrawal has sued both Defendants in their individual capacities only.  Neither of the Defendants remain at the University of Cincinnati, which moots any prospective claim for relief Dr. Agrawal might assert against either of them.  Dr. Agrawal suggests that the Sixth Circuit's decision in McCormick v. Miami Univ., 693 F.3d 654 (6th Cir. 2012), holding that Section 1983's express cause of action against state-actor defendants precludes damage claims under Section 1981, is merely one decision by "one panel in a much larger circuit."  (Doc. 90 at 45)  This Court cannot so cavalierly ignore controlling authority from the appellate court; and Dr. Agrawal eventually concedes that McCormick bars his damages claims under Section 1981.  Defendants are therefore entitled to judgment on those claims.

-28-

III.    Section 1983

Dr. Agrawal contends that Montemagno and Bryan, acting under color of state law in their capacities as officers of the University, discriminated against him and violated his equal protection rights on the basis of his national origin and his race. Defendants raise a number of arguments in support of their motion for summary judgment on these claims: (A) many of the alleged discriminatory acts occurred more than two years before Dr. Agrawal filed his complaint and are time-barred; (B) he has no direct evidence of discrimination; (C) he cannot establish a prima facie case based on indirect evidence; and (D) even if he could establish a prima facie case, he has no evidence of pretext.

(A) Statute of limitations and continuing violations.  Dr. Agrawal relies on the continuing violations theory to argue that so long as the last alleged discriminatory act (the denial of his merit pay increase in 2010) occurred within two years of his October 1, 2010 complaint, he may recover for all other events that he alleges constitute a series of related discriminatory actions.  He contends that Montemagno embarked on a course of discrimination against him that began when Montemagno arrived at UC in the summer of 2006, including the withdrawal of the OBR funds, the transfer of his office space and reduction in lab space, the incidents surrounding Xie's employment, the subsequent Article 9 investigations, the temporary grant restrictions, and denial of merit pay.

In Sharpe v. Cureton, 319 F.3d 259 (6th Cir. 2003), several firefighters brought Section 1983 claims against a fire chief and other local officials alleging a series of discriminatory and retaliatory acts.  The court held that plaintiffs could not recover for discrete acts (in that case, transfers to less desirable duty stations) that occurred

outside the applicable limitations period. Plaintiffs argued that the continuing violations

theory permitted them to recover for all adverse acts irrespective of the statute of

limitations. The Sixth Circuit had previously recognized two "distinct categories of

continuing violations, namely, those alleging serial violations and those identified with a

longstanding and demonstrable policy of discrimination." Id. at 266. The court also

cautioned that the doctrine most commonly applies to Title VII claims, and "rarely

extends" to Section 1983 actions. Then in National Railroad Passenger Corp. v.

Morgan, 536 U.S. 101 (2002), the Supreme Court held: "Discrete discriminatory acts are

not actionable if time barred, even when they are related to acts alleged in timely filed

charges. Each discrete discriminatory act starts a new clock for filing charges alleging

that act." Sharpe, 319 F.3d at 267, quoting Morgan, 536 U.S. at 113. Finding no basis

upon which to restrict Morgan to discrimination claims brought under Title VII, the Sixth

Circuit held that the continuing violations doctrine did not apply to preserve the

firefighters' Section 1983 claims arising from discrete acts that occurred outside the

limitations period. Dr. Agrawal argues that the incidents of discriminatory conduct that

he alleges occurred are sufficiently related that he may rely on a continuing violations

argument. Morgan and Sharpe foreclose that argument.

Dr. Agrawal also relies on the second strand of the continuing violations theory,

that Defendants (and perhaps other departments in the College) engaged in a

continuous and long-standing policy of discrimination against individuals of Indian

descent. He argues that his department "was generally hostile to Indians in particular,

and 'Easterners' in general." (Doc. 90 at 47-48) He cites two examples of this purported

long-standing policy: Montemagno's alleged mistreatment of Professor Bhattacharya,

and Professor Purdy's class conduct of asking "Easterners" to sit in the back, using the offensive phrase "turbanheads" to describe some students, and making generally disparaging comments about "foreigners."  This evidence is insufficient to establish or reasonably suggest the existence of a "longstanding and demonstrable policy of discrimination" engaged in by the Defendants or by UC in general.  Such a policy was present in Alexander v. Local 496, Laborers' Int'l Union, 177 F.3d 394, 408-409 (6th Cir. 1999), involving a challenge to a union's longstanding "working in the trade" rule that clearly served to perpetuate the exclusion of African-Americans from union membership.  Dr. Agrawal has no evidence of a  discriminatory policy at UC or the College of Engineering or within his department, much less a policy perpetuated or enforced by either of the Defendants.  Montemagno's alleged mistreatment of Professor Bhattacharya does not suffice, especially considering that Montemagno was the Dean of the College of Engineering when Professor Bhattacharya was hired as departmental chair, and that Bhattacharya refused to attribute what he agreed was Montemagno's "autocratic" decision-making style to discriminatory animus towards individuals of Indian or Asian descent.[6]  With regard to Professor Purdy, Defendants persuasively argue that his offensive comments cannot be attributed to either Montemagno or Bryan (or to UC generally).  The documents from his disciplinary file reflect that an allegation against Purdy of using such discriminatory language was made in 2000, long before Montemagno arrived at UC and Bryan assumed the post of Vice Provost.  (Doc. 94, Ex.

---

[6] Bhattacharya Dep.at 108-110.  Carter agreed that Montemagno's "style definitely was more autocratic, where the department heads, more or less, just implemented his policies and whatnot and didn't have what I would have preferred, the flexibility." (Carter Dep. at 69)

13 at CM/ECF PAGEID 5740-5779)

The Court agrees with Defendants that Dr. Agrawal may not rely on the

continuing violations theory to recover for any alleged discriminatory acts that occurred

more than two years before he filed his complaint.

(B) Direct Evidence of Discrimination.  While he concedes that "most" of the

evidence he proffers is of the indirect variety, Dr. Agrawal also contends that he has

offered direct evidence of Montemagno's discriminatory animus.  At the second

grievance panel hearing in May 2010, Montemagno was asked about the restriction

imposed of not assigning new graduate students to Dr. Agrawal; he responded that the

restriction:

> ... has to do with funding.  The idea was that Professor Agrawal has a
> number of students, some of whom are very, very late in their career who
> are unemployed in terms of financially and they have no money to finish
> getting their degrees [sic].  And in the engineering programs, you have to
> pay your students, and it's necessary for them to graduate in the
> appropriate manner.
>
> And I believe that there is a cultural divide between the way I believe
> graduate students should be mentored and taken care of and the way
> Professor Agrawal believes graduate students should be mentored and
> taken care of.

(Doc. 79, Ex. 2, TR at 73) Later in the hearing, he was asked what he meant by a

"cultural divide" and he explained:

> I think graduate students are junior colleagues, people who you bring in  ...
> to mentor, you care about their welfare, you do the very, very best to
> ensure their success and ensure that their education is absolutely the best
> that you can deliver to them.
>
> And I think that there is some thought that people treat graduate students
> as second-class citizens who are lucky to be in your laboratory and lucky
> to have - be graced with your presence and are left to their own devices to
> be successful.  And I choose to have a college that's more nurturing and

-32-

that embraces an attitude towards my students, which I think is not consistent with the history that Professor Agrawal has demonstrated.

(Id. at 77-78)

In his deposition, Montemagno further explained his comment:

A. I believe to -- I believe to get the best out of students, you need to treat them as peers, and you need to try to provide resources and opportunities for them that allow them to grow and flourish.  And I don't recall speaking about this specifically to Dr. Agrawal.  But I have a number of faculty who view their graduate students as labor and who -- they get their education while they're providing services for the faculty members. But their primary job is to provide research service for the faculty members, and they have to gather their education while they're doing this process. It's a -- it's a way of -- a way students are addressed.  I've had a large number of students who have come from all over the world. I have graduate students from China, from India, from Armenia, from Singapore. And they all come with a set of cultural differences that are -- within their previous experience that are different than US universities. They are much more -- they have a much more deferential position in dealing with their faculty members. And I work very hard to have the responsibility to make them into my peer. And that's really what the difference is.

Q. Are you suggesting that Agrawal was in that category?

A. I'm not making any suggestion at all.  Because I don't think I referred that directly to Professor Agrawal. I think I was talking about the fact that there was a cultural difference in many of my faculty on how they believe graduate students should behave. And I think it impacts the quality of the students that you end up getting, and how you're able to place those students once they graduate.

(Montemagno Dep. at 230-231)

"Direct evidence is evidence that proves the existence of a fact without requiring

any inferences."  Rowan v. Lockheed Martin Energy Systems, 360 F.3d 544, 548 (6th

Cir. 2004).  In the context of discrimination claims, direct evidence is

evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more

-33-

likely than not was a motivating factor in the employment
decision. *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718,
724 (8th Cir. 2001)(citations omitted). Only the most blatant
remarks, whose intent could be nothing other than to
discriminate ..., satisfy this criteria. *Carter v. City of Miami*,
870 F.2d 578, 582 (11th Cir. 1989).

Scott v. Potter, 182 Fed. Appx. 521, 525-26 (6th Cir. 2006). Dr. Agrawal suggests that

Montemagno's "cultural divide" statements directly manifest his discriminatory "racial

opinions about Eastern slave labor vs. Western 'peers.'" (Doc. 90 at 51) The Court

disagrees. Montemagno's statements can be interpreted to mean several different

things, and several inferences would be necessary to conclude that Montemagno's

observation of "cultural differences" about the appropriate education and development

of graduate students directly manifests a discriminatory animus towards "Eastern" (e.g.,

Indian) faculty members. This is particularly true because Montemagno did not use the

terms "Eastern" or "Western" or suggest anything about "slave labor." The same sort of

argument was made in Scott, where plaintiff alleged that his supervisor's statement to

him, "Why don't you retire and make everybody happy," was direct evidence of age

discrimination. The Sixth Circuit rejected his argument because "retire" is not

synonymous with "old" or "age," and there was no evidence that the supervisor used the

term as a proxy for discriminatory bias due to plaintiff's age. Montemagno's comment

about a "cultural divide" between faculty members is even more removed from any

suggestion of national origin discrimination.

Dr. Agrawal also cites Professor Purdy's discriminatory comments about Asian

students to suggest that Montemagno's "cultural divide" comment was anything but an

innocuous "stray remark." The Court already rejected the attempt to impute Purdy's

comments or his attitude to either of the Defendants; and Purdy's conduct does not amount to direct evidence of Defendants' discriminatory animus. Purdy played no role in any of the Defendants' decisions about Dr. Agrawal. The Court concludes that Agrawal has not offered direct evidence of national origin discrimination.

(C) Prima Facie Case of Discrimination. Analysis of a discrimination claim based upon indirect evidence proceeds under the familiar Title VII burden-shifting framework. Dr. Agrawal can establish a prima facie case of discrimination by showing (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was less favorably treated than a similarly-situated person outside his protected class. And in a Section 1983 claim, he must also show that the defendant personally participated in the alleged discriminatory conduct. Adair v. Charter County of Wayne, 452 F.3d 481, 493 (6th Cir. 2006). The precise contours of a prima facie case will vary depending on the facts, and the requirements were "'never intended to be rigid, mechanized, or ritualistic.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Plaintiff's prima facie burden is not onerous, but simply raises a rebuttable presumption of discrimination. Cline v. Catholic Diocese, 206 F.3d 651, 660 (6th Cir. 2002) (internal citations and quotations omitted).

Defendants do not dispute the first two prongs of the prima facie case, but contend that most of the conduct Dr. Agrawal complains about did not amount to an actionable adverse employment action. And for any acts that are were, Defendants contend that Dr. Agrawal has not identified any similarly-situated comparator who was treated more favorably than he was treated.

-35-

(1) Materially Adverse Actions:  The Court already concluded that the challenged acts or conduct that occurred more than two years before his complaint was filed are time-barred; these include transfer of the OBR funds, transfer of his office space, and reduction of his laboratory space and the number of his graduate students.  But even if claims had been timely filed concerning these actions, the Court agrees that they are not actionable as adverse employment actions.  The OBR funds were not a guaranteed source of revenue for Dr. Agrawal or for UC, but were intended to foster the development of the interdisciplinary center and the doctoral programs.  Dr. Agrawal admits that any proposals to use those funds (outside of his own salary) had to be approved by his department chair.  (Agrawal Dep. at 172)  Moreover, it was Professors Carter and Paul who initially started questioning Dr. Agrawal's decisions about the use of OBR funds and who initially instituted restrictions on those funds in May 2006.  Similarly, the transfer of his office space and reduction in his laboratory space are not materially adverse actions.  Dr. Agrawal does not claim that he was completely deprived of office space; and he complains that reduced laboratory space affected his research program, but has not come forward with facts showing that the reduction actually caused him any specific damage or material loss.

The first alleged adverse action that took place within the two years preceding his complaint is the October 3, 2008 letter to Dr. Agrawal from Montemagno that  initiated the first Article 9 proceeding.  Employer investigations into suspected wrongdoing are not generally considered to be actionable adverse employment actions, standing alone.  See, e.g., Arnold v. City of Columbus, 515 Fed. Appx. 524, 531 (6th Cir. 2013); Dendinger v. Ohio, 207 Fed. Appx. 521, 527 (6th Cir. 2006).  Dr. Agrawal complains

-36-

about the "spurious" nature of the investigations launched by Defendants. Even if the launch of two investigations could be considered to be adverse actions, the record supports the Defendants' contention that the first investigation was prompted by Xie's letter, and the second by Dr. Agrawal's own hearing testimony.

Montemagno's proposed disciplinary measures prior to the first grievance panel hearing - an increase in Dr. Agrawal's teaching load, the loss of his Distinguished Professor title, and reimbursement of $24,000 that UC paid to Xie - were never implemented.  An employer's proposed disciplinary actions that are never implemented are not actionable; see Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182 (6th Cir. 2004)(proposed pay reductions and job reassignments that were never implemented are not adverse actions).  The letter of reprimand recommended by the first grievance panel has never been found and apparently was not put in Dr. Agrawal's file.  While Dr. Agrawal suggests that the "threat" of the letter could pose an "open question" for his future, the grievance panel independently made that recommendation, not either of the Defendants.  In addition, Defendants cite cases finding that a letter of reprimand is not a materially adverse action unless it is accompanied by a more concrete loss, such as a demotion or a salary reduction.  See Jones v. Butler Metro. Hous. Auth., 40 Fed. Appx. 131, 137 (6th Cir. 2002), citing Krause v. City of La Crosse, 246 F.3d 995, 1000 (7th Cir. 2001).

With regard to the temporary grant restrictions Bryan imposed in August 2009, Defendants cite Mitchell v. Vanderbilt Univ., supra, where a professor brought age discrimination claims based on a number of actions taken by his department chairman, Graham.  Those actions included reducing plaintiff's lab space; revocation of his mentor

-37-

status; loss of a research assistant; a proposed but unimplemented pay reduction and a less prestigious appointment; a special requirement that plaintiff submit all of his grant proposals to Graham for his review prior to submission to NIH; and removing plaintiff from his position as Medical Director of Pathology Services.  The Sixth Circuit found that the challenged actions, viewed "either independently or collectively," did not constitute **material** adverse employment actions.  With regard to the restriction on NIH grant applications, the court noted that it was "properly considered good institutional administration rather than a materially adverse employment action" in view of plaintiff's history of "hurriedly prepared" applications.  Mitchell, 389 F.3d at 182.  Here, both of the grievance panels cited problems with Dr. Agrawal's grant-related conduct and his failure to abide by University policies concerning grant submissions and reporting.  Dr. Agrawal has not shown that these temporary restrictions materially affected the terms and conditions of his faculty appointment, as the second grievance panel concluded.

Defendants concede that the denial of the 2010 merit pay increase is an adverse employment action, as it directly affected Dr. Agrawal's salary.  But they argue that Dr. Agrawal has not identified any similarly-situated non-protected faculty members who were treated differently with respect to the merit pay, or with respect to any of the actions that Dr. Agrawal challenges.

(2) Similarly-Situated Comparators.  Dr. Agrawal offers a number of other faculty members who he contends were more favorably treated by the Defendants after they engaged in comparable conduct.  He cites Wright v. Murray Guard, 455 F.3d 702 (6th Cir. 2006), which discussed this prong of a prima facie case:

In the disciplinary context, we have held that to be found similarly situated,

> the plaintiff and his proposed comparator must have engaged in acts of comparable seriousness . ... To make this assessment, we may look to certain factors, such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. ... However, when such factors are not relevant, we need not consider them. Rather, to determine whether two individuals are similarly situated with regard to discipline, we make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the proposed comparable employee.

Id. at 710 (internal citations and quotations omitted).  Dr. Agrawal's proposed comparators need not be identically situated, but they must have engaged in similar conduct under circumstances that cannot be meaningfully differentiated from Dr. Agrawal's situation, and yet were treated more favorably by the Defendants.

Dr. Agrawal contends that before the problems involving Xie, Montemagno did not "force" white professors out of their office space, reduce their laboratory space, or "divert" their research funds, as he contends Montemagno did to him.  (Doc. 90 at 70) These events are not materially adverse employment actions, as discussed previously. Dr. Agrawal then cites a list of faculty members against whom Montemagno initiated Article 9 proceedings during his tenure as Dean.  He alleges that Montemagno treated each one far more favorably than he treated Dr. Agrawal, despite the comparative seriousness of their alleged offenses.  He argues that Montemagno "never proposed that a non-Indian professor be banned from campus, or suggested that they should pay the University's debts out of their own pockets."  (Doc. 90 at 72)

Peter Disimile was the subject of Montemagno's July 18, 2008 Article 9 letter, which cited concerns about Disimile's relationship to a private company of which Disimile's wife was president, and whether he needed a conflict management plan;

Disimile's submission of journal articles that did not acknowledge his faculty status, and in some cases claimed he was employed by the private company or by Wright Patterson Air Force Base; the possible use of university resources by Disimile's co-author who was not a UC employee, and questions about an analyzer that was taken to Wright Patterson; Disimile's cancellation of classes without notice to the department, and his unwillingness to learn a software application required for a course; his claim to be on sick leave when no request had been processed or approved; and his unwillingness to accept committee assignments concerning an upcoming accreditation visit.  (Doc. 94, Ex. 14)   After discussing these issues with Disimile, Montemagno proposed discipline that included requiring Disimile to amend his outside activities report, properly report his collateral employment, state his UC affiliation on all publications, assure that none of his students is employed by the private company, obtain written approval of his department chair prior to missing a class or other UC obligations, learn the lab course software, and participate fully in all assigned or volunteer service commitments at UC.  A written warning would also be placed in his file.  (Id. at CM/ECF PAGEID #5781-5782)  Disimile requested mediation, but the final result of the process is not included in the record.

The next proposed comparator is Steven Clarson.  Montemagno's April 2009 Article 9 notice states that Clarson failed to report final grades for numerous students in two of his fall 2008 classes.  (Doc. 94, Ex. 15)  According to Montemagno's letter of proposed discipline, Clarson not only failed to report the grades but ignored all attempts by students and other faculty to contact him.  After one of his students filed a grievance against him and Montemagno scheduled his initial disciplinary meeting, he submitted

the last of the missing grades.  Montemagno concluded that his failures and his explanations for those failures amounted to "serious lapses of professionalism" and noted that Clarson's behavior was "at odds with my previous perceptions of your performance as a faculty member, and for that reason alone, I am proposing only modest discipline."  (Id. at CM/ECF PAGEID #5787)  Clarson received a written reprimand, and was required to write a letter of apology to his students and to his hearing committee.

Clarson was the subject of another Article 9 investigation in April 2012. Montemagno alleged that Clarson failed to properly report sick time, and his students were complaining about his absences affecting his teaching; he failed to timely submit an NSF final report; and he was not responding to requests for help in launching a project.  (Doc. 94, Ex. 19)  During a July 2012 meeting with Montemagno, Clarson proposed that, as an alternative to discipline, he would request sick leave for the coming semester in order to get medical treatment for an unspecified illness that he said was responsible for his conduct.  Montemagno tentatively accepted his proposal if he reduced it to writing and its written terms were acceptable to the Dean.  But Clarson failed to follow through on the proposed agreement and disappeared for the following semester.  By then, Montemagno had left UC; and in November 2012 the interim dean recommended that Clarson be suspended for 7 weeks without pay.  (Id. at CM/ECF PAGEID #5836-5838)

The next proposed comparator, Daniel Oerther, was the subject of an October 2009 Article 9 investigation, based on allegations that he left the country for at least two weeks and was not teaching three assigned classes during that time; that he had done

the same thing the previous year; and that he was not fulfilling certain requirements of NSF grants.  (Doc. 94, Ex. 16)  More detailed charges were contained in a November 9, 2009 letter from Bryan, alleging that Oerther took several international trips without getting prior authorization as required by College policies, that he took trips during times he had teaching and advising responsibilities, leading to student and faculty complaints that he was frequently unavailable for meetings and assistance; and the previous year the receipt of some NSF grant funds had been delayed because Oerther did not timely complete annual project reports.  These allegations were resolved by agreement after Oerther wrote a letter of apology, admitting that his travel policy violations were serious and pledging to comply henceforth.  (Id. at CM/ECF PAGEID #5789)  A letter of warning was placed in Oerther's file for five years, and any further incidents would result in additional progressive discipline.  (Id. at CM/ECF PAGEID #5799)

The next comparator, Professor Purdy, was the subject of an Article 9 investigation in October 2009, after a complaint was lodged by a non-engineering UC staff member.  Purdy approached two women having lunch together on campus; one of the women was holding her 12-week old infant.  Purdy made an offensive, sexist comment about the infant in front of the women.  The staff member who heard Purdy's comment found it "appalling and disgusting," stating that Purdy demonstrated "a blatant disrespect and disregard for women on any other level than sexual servants."  (Doc. 94, Ex. 17 at CM/ECF PAGEID #5802-5803)  The investigation revealed that Purdy was off duty that quarter and was being treated by a psychiatrist.  Purdy wrote a letter apologizing to the woman, explaining that his doctor had put him on new medication that resulted in side effects which he believed caused his very inappropriate behavior.

-42-

He stated that he was not trying to excuse his behavior and was truly sorry for the incident.  The woman then wrote to Bryan to thank him for his diligence in handling the situation, stating she was pleased with "how quickly and efficiently this incident was handled."  (Id. at CM/ECF PAGEID #5809)  Ultimately, Montemagno decided not to take disciplinary action against Purdy.

Professor Annexstein was the subject of Montemagno's April 15, 2011 Article 9 letter, which alleged that Annexstein neglected his duties to prepare certain exam questions, to advise CS undergraduate students, and to serve on the School Curriculum Committee.  (Doc. 94, Ex. 18, at CM/ECF PAGEID #5833)  Bryan's June 10 letter to Annexstein amplified these charges (Id. at PAGEID #5810-5811), which were based on a complaint from Professor Bhattacharya to Montemagno and documented in a series of emails between Annexstein and Bhattacharya.  Prior to the initial disciplinary meeting with Montemagno and Bryan that took place in mid-June, Annexstein's co-teacher for the CS undergraduate class at issue in the allegations (Professor Davis) informed Bryan that contrary to Bhattachayra's complaint, Annexstein fully participated in the class, made important contributions to the undergraduate design competition, and worked throughout the year with CS students on their projects.  Professor Davis believed that Annexstein "fulfilled all duties required of him for the senior design sequence."  (Id. at PAGEID #5831)  After Montemagno and Bryan met with Annexstein,  Montemagno decided not to propose any discipline.  Bryan told Annexstein that their  meeting had been "productive, and we hope that it will lead to better communications and understanding in the future."  (Id. at PAGEID #5812)

Dr. Agrawal summarizes the allegations made by Montemagno in each of these

investigations and compares them to those made against him, which he contends was
simply an "unauthorized hiring of post-doc." (Doc. 90 at 77)  Based on his own
evaluation of the severity of the conduct in each case and the discipline that was
proposed, he argues that Montemagno treated him far more harshly than any of the
others.  The Court cannot agree.  What Montemagno may have originally proposed in
the way of disciplinary measures for any of these faculty members is not an adverse
employment action.  The ultimate discipline imposed in several of these cases was
more harsh than that imposed on Dr. Agrawal.  And in other cases (for example, Purdy
and Annexstein), extenuating circumstances existed that eventually resulted in no actual
discipline.  Moreover, there is no reasonable inference raised that the process by which
the Article 9 allegations against each faculty member were launched or investigated
was significantly different from that followed for Dr. Agrawal.

Regarding the issue of "backdooring" grants (submitting grant proposals to
funding agencies before SRS review): Dr. Agrawal contends that many faculty members
did so but he was the only one singled out by Montemagno for discipline.  He cites two
incidents involving Dr. Keener, who submitted two grant applications to SRS (November
20 and November 30, 2009) approximately one hour before the applications were due
to the granting agency.  (Doc. 94, Ex. 23)  SRS sent a memo to Keener telling him that
the applications had been submitted without SRS review, but that any problems that
might arise from the lack of institutional review would be the responsibility of Dr.
Keener's department.  Dr. Agrawal also claims that at least three other Engineering
faculty members submitted several "backdoored" grants between 2009 and 2012, but
there is no evidence of any discipline taken against them.  (Doc. 90 at 58, n. 275)  The

allegation concerning Dr. Agrawal's failure to abide by SRS policies was raised in Montemagno's October 3, 2008 letter to Dr. Agrawal, and was based on Dr. Agrawal's own statements to Montemagno and Faaborg, that the SRS administration was too burdensome and took too much time, and so he intentionally bypassed those policies and procedures.  The grievance hearing panel concluded that Dr. Agrawal has "readily admitted that he would often submit his grant proposals for approval after they  had already been submitted to granting agencies."  (Agrawal Ex. AAA at 4, ¶1) The fact that other faculty may have failed to comply with SRS deadlines on other occasions does not support a reasonable inference that those faculty are similarly situated to Dr. Agrawal, because there is no information provided about the reasons for any faculty member's failure to timely submit the proposals to SRS.  There is no information suggesting that Professor Keener deliberately ignored the SRS deadline when he submitted the two grant proposals reflected in Exhibit 23; nor is there any information that the other three Engineering faculty members Dr. Agrawal cites had routinely ignored SRS and had readily admitted that they did so.  The Court cannot conclude that Dr. Agrawal was treated differently by Montemagno on this issue.

Regarding Bryan's imposition of grant restrictions: Dr. Agrawal cites two faculty members that were subject to Article 9 investigations regarding their grant expenditures, but neither of them had any restrictions imposed.  On September 8, 2011, an Article 9 investigation against Professors Beyette and Wilsey was initiated by Santa Ono, then the Senior Vice President and Provost of the University (Doc. 94, Ex. 20 at CM/ECF PAGEID #5865 (Beyette), and Ex. 21 at PAGEID #5898 (Wilsey)).  UC received an anonymous complaint that they were using federal grant funds to benefit Beyette's

private company (Xanthostat Diagnostics), and that the company improperly billed its services under a federal NIH sub-award.  Beyette was the Principal Investigator on the federal grant in question.  Christine Ackerman and the Office of Internal Audit began a comprehensive investigation, as they did with Dr. Agrawal.  The January 2012 Final Audit Report concluded that Beyette did not accurately report Xanthostat's costs that were billed to that grant; that he had likely violated UC conflict management rules when he certified that Xanthostat had satisfactorily performed those services; and that he failed to clearly disclose the potential conflict between his roles as grant PI and an owner of Xanthostat.  (Doc. 94, Ex. 20 at CM/ECF PAGEID # 5843-5845)  And with respect to Professor Wilsey, the audit report found that his wife owned another company (Clifton Labs) that was Xanthostat's vendor, and that Wilsey had a 9% equity interest in Xanthostat.  The report concluded that Wilsey may have violated conflict reporting rules and state ethics laws concerning his involvement in certifying payments to Xanthostat from the grant funds due to his ownership interests.  (Doc. 94, Ex. 21 at PAGEID #5882-5883)   The reports for both faculty members recommended that UC make additional disclosures to NIH to explain these relationships, and that UC refund approximately $125,000 of payments it had received from the grant.  After the initial Article 9 meetings were held and both professors (through their respective lawyers) responded in writing to the charges, Provost Ono proposed that each receive a written letter of reprimand placed in their personnel file, and that for a period of one year, each would assist the Office of Research in providing training to fellow faculty members on issues of understanding, disclosing, and managing potential conflicts of interest.  (Doc. 94, Ex. 20 at PAGEID #5863; Ex. 21 at PAGEID #5896-5897)  Neither professor

challenged the proposed discipline, and no hearing panel was convened.

Defendants argue that UC investigated these grant-related allegations in the same manner that it investigated the allegations concerning Dr. Agrawal, and took appropriate steps to resolve the charges.  In both cases, the original complaint (from Xie against Dr. Agrawal, and an anonymous tip regarding Beyette and Wilsey) led to additional allegations and concerns as the investigations progressed.  Defendants also assert that Beyette's and Wilsey's conduct was not comparable to that of Dr. Agrawal's with respect to UC's institutional risk exposure.  As the Court understands the situation with Beyette and Wilsey, Beyette's private company billed UC for its grant services in an amount that exceeded the federal allowable cost guidelines.  As a result, the audit report recommended that the company reimburse UC for the excess, and that UC in turn reimburse the federal sponsor.  In Dr. Agrawal's case, UC paid Xie $24,000 using its internal ("local") funds, presumably an unforeseen and unplanned-for expenditure. Moreover, Beyette and Wilsey both received a written letter of reprimand that was placed in their file while Dr. Agrawal did not.  And with respect to Dr. Agrawal's grant restrictions (which were not imposed on Beyette or Wilsey), the Court notes the grievance panel concluded that they were no more onerous than those placed upon all UC faculty members.

Regarding the issue of the 2010 merit pay: Dr. Agrawal argues that Montemagno approved merit increases for Caucasian professors (Annexstein and Schlipf), but asserts that their performance was far less impressive than his own.  Defendants note that Dr. Agrawal's opinion about other faculty members' performance is based entirely upon his own subjective assessment of faculty resumes and websites.  He testified that

other faculty members were feeding false information to Montemagno by suggesting that Dr. Agrawal's research was "... not productive, I don't have any grant, I'm not publishing, nobody's referring to my work. And I have a document to show that I'm one of the five people highly cited in the whole campus. And I'm number one among all the people in the campus. All faculty members in the campus, I'm number one. Nobody competes with me. Not a single faculty member, including medical school." (Agrawal Dep at 92) Dr. Agrawal's assessment of his own research productivity is not sufficient to rebut the explanations offered by Montemagno for the decisions with regard to merit pay awards. Dr. Agrawal also ignores Montemagno's testimony that existing salaries were a factor he considered; and he does not dispute that his own salary was much higher than all others in his department. And Dr. Agrawal's subjective performance assessment also goes beyond the time period that the CBA defined for purposes of merit pay (September 1, 2008 to December 30, 2009). Furthermore, Montemagno asked the Associate Deans who reassessed Bhattacharya's performance ratings to evaluate faculty with respect to the entire College faculty, and not solely in their own department. (Doc. 84, Ex. 1, Montemagno Aff. at ¶9) Ultimately, Montemagno approved a merit pay increase for Annexstein, Schlipf, Bhattacharya, and Bhatnagar, and denied a raise to Berman, Purdy and Agrawal. There is no inference of animus against Indian faculty members that arises from that decision.

Given these facts, the Court must conclude that Dr. Agrawal has not shown that Montemagno treated a similarly-situated faculty member more favorably with respect to merit pay.

(C)  Pretext.  But assuming that Dr. Agrawal could establish a prima facie case of

-48-

discrimination with respect to any of the challenged actions, Defendants have offered a reasoned explanation for the decisions and actions taken.  The incidents surrounding Xie and Dr. Agrawal's admitted lack of compliance with UC rules and grant policies prompted  the Article 9 investigations, which in turn led to the temporary grant restrictions.  Dr. Agrawal's performance over the merit pay assessment period (September 2008 through December 2009) included those ongoing investigations, his April 2009 hearing testimony concerning Xie, and his refusal to execute proper labor verification statements.

Dr. Agrawal must demonstrate that Defendants' explanations are mere pretext for discrimination.  He may do so by showing that the stated reasons (1) have no basis in fact, (2) did not actually motivate the challenged conduct, or (3) were insufficient to warrant the challenged conduct.  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994);  Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  The Sixth Circuit has explained that it has "… never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer [take the challenged actions against] the employee for the stated reason or not?"  Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012)(internal quotations and citations omitted).  Dr. Agrawal must produce "sufficient evidence from which the jury could reasonably reject [Defendants] explanation and infer that [Defendants] intentionally discriminated against him."  Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003).   The first method essentially attacks the credibility of the employer's reason.  But when the employer can show an honest belief in the basis for its proffered reason, in that it reasonably relied on particularized facts known at the time

-49-

it made the decision, a plaintiff has not shown that the reason is pretextual.  "As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."  Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 285-86 (6th Cir. 2012)(internal citation omitted).

After suggesting that Sixth Circuit pretext jurisprudence is "counter-intuitive" and something of a "mystery," Dr. Agrawal argues that his pretext evidence satisfies all three pathways and that he is entitled to a jury trial on the ultimate question of discrimination. (Doc. 90 at 90-91)  Initially, he argues that since Defendants did not address pretext with respect to conduct that occurred outside the limitations period, they have conceded his claims.[7]  But Dr. Agrawal fails to recognize Defendants' explicit argument that the pre-October 2008 events are time-barred and, alternatively, do not amount to adverse employment actions.  While he disagrees with Defendants, their motion does not "ignore" this conduct.  Moreover, under the well-established rubric for analyzing discrimination claims at the summary judgment stage, it is plaintiff's burden to come forward with evidence of pretext.  A defendant has no obligation to anticipate and respond to pretext arguments in its initial motion, and Defendants' reply brief addresses Dr. Agrawal's pretext arguments.

Dr. Agrawal concedes that the accusations Xie made in his letter were something that UC "should look at seriously" (Agrawal Dep. at 257-258), but he complains that no one talked to him about Xie until after Montemagno's Article 9 letter.  With respect to

---

[7] He suggests that Defendants' position throughout the litigation "has largely been to ignore these actions and hope no one notices."  (Doc. 90 at 91)

Bryan's temporary grant restrictions, Dr. Agrawal claims that the first hearing panel's decision did not instruct Bryan to take any action against him, but merely recommended that the issues surrounding Xie's payments be "investigated."  He  suggests that the Defendants should have known that there was something "fishy" about Dr. Agrawal's own testimony (that he paid Xie for six months when he was not working on Dr. Agrawal's grant).  (Doc. 90 at 92)  He accuses Bryan of hiding the fact that Xie confirmed that he had worked for Dr. Agrawal during the time that Dr. Agrawal told the hearing panel that Xie was not working.  He therefore accuses both Bryan and Montemagno of having "actual knowledge that no wrong had been done" (Id.), and therefore that the imposition of grant restrictions lacked a factual basis.

Dr. Agrawal minimizes the legitimate concerns raised by his **own** testimony, and simply attacks the facts and evidence that supported the investigations undertaken by Defendants and by the other UC departments.  He repeatedly claims that there is "nothing wrong" with paying someone for work that was performed away from campus. That may well be true but that was not the import of Dr. Agrawal's hearing testimony, nor the basis for the concerns arising from his testimony and the issues surrounding the labor verification statements.  The issue was not **where** Xie (or any other graduate student) was working, but whether Dr. Agrawal had properly reported work performed on any specific grant.  The email from Bryan to Montemagno, summarizing Bryan's personal visit to Xie on August 27, 2009 (Montemagno Ex. 19), does not support Dr. Agrawal's assertion that Bryan "knew" by then that "no wrong had been done."  To the contrary, the verification statements that Dr. Agrawal signed had reported that 100% of

Xie's efforts were paid from one of Dr. Agrawal's grants, while the Bryan email states that Xie estimated that his effort was divided among direct work on two grants (10%), work on papers related to grants (15%), work on papers unrelated to grants (20%), work on other proposals (15%), and work on a book co-authored with Dr. Agrawal (40%). This is hardly "proof" that Defendants' reasons for investigating Dr. Agrawal or imposing temporary grant restrictions lacked a factual basis.

Nor does Dr. Agrawal come forward with evidence raising a reasonable inference that Bryan's restrictions were not actually motivated by the factors Bryan cited: Dr. Agrawal's testimony, Lu's refusal to sign verification statements for two of Dr. Agrawal's students, and Dr. Agrawal's failure to execute proper verification statements. He accuses Bryan of complicity in Montemagno's "campaign" against him, but he has no credible evidence to support those accusations. Nor has Dr. Agrawal demonstrated that his conduct was insufficient to warrant Bryan's restrictions. The Internal Audit report (entirely separate from Bryan and Montemagno) recommended that the four controls that Dr. Agrawal agreed to in December 2009 be made permanent. The second grievance panel concluded that "respondents had good reason to distrust Dr. Agrawal and to restrict student related grant activity. The internal controls are fully warranted administrative fiscal remedies ...". (Agrawal Ex. PPP at 5) The findings of two separate internal investigations fully support Defendants' assertion that the grant restrictions were imposed based on Dr. Agrawal's own conduct.

Regarding Montemagno's denial of a merit increase, Dr. Agrawal repeatedly insists that he was the most productive and successful faculty member (in his department and in the entire university) under any relevant measure. (Doc. 90 at 97-98)

He insists that the internal audit report findings and the grievance panel decisions were entirely the result of Montemagno's and Bryan's bias and their discriminatory actions, and not based on anything that Dr. Agrawal did or failed to do.  Dr. Agrawal cannot simply attack the reasons Defendants have offered for an adverse action.  He must produce some evidence that gives rise to a **reasonable** inference that those reasons did not actually motivate the actions.  Based upon the facts discussed in the audit reports, Dr. Agrawal's own admissions at the disciplinary hearings, and the conclusions of two hearing panels, the Court cannot conclude that the reasons Defendants have offered concerning the denial of merit pay are mere pretext to disguise discrimination.

Considering the entire chain of events of which Dr. Agrawal complains, the Court must conclude that he has failed to establish a genuine factual dispute concerning whether the Defendants discriminated against him or violated his equal protection rights based on his national origin or his race.

IV.    Procedural Due Process

Dr. Agrawal alleges that Montemagno and Bryan violated his constitutional procedural due process rights.  He cites this Court's decision denying Defendants' motion to dismiss his due process claims as they are alleged in his complaint, and he questions why the Defendants are challenging these claims again.  The Court denied dismissal of those claims under Fed. R. Civ. Proc. 12(b)(6), as Dr. Agrawal's complaint alleged that sanctions had been imposed upon him despite a "favorable hearing determination."  This Court found those allegations sufficient given the lack of a fully developed factual record.  (See Doc. 13 at 12)

To establish a procedural due process claim, Dr. Agrawal must show that he had

a protected property or liberty interest, and that the Defendants deprived him of that interest without a hearing. A protected property interest is one to which a plaintiff has a "legitimate claim of entitlement" under state law. See, e.g., <u>Ferencz v. Hairston</u>, 119 F.3d 1244, 1247 (6th Cir. 1997), rejecting claims by building contractors that they had a protected property interest in remaining on a list of eligible bidders for federally-funded rehabilitation projects. Placement on the bidders list did not guarantee that they would be awarded any contracts. While they alleged that city officials failed to follow established procedures in removing them from the list, the Sixth Circuit held that such procedural failures do not create a property right.

Dr. Agrawal contends that all of the cited deprivations and actions between 2006 and 2010 infringed his protected property interests. The Court disagrees. Dr. Agrawal has no evidence that he had a legitimate claim of entitlement to a particular office space or a specific size of laboratory. He has not shown a property interest in the OBR funds, because the Ohio Board of Regents retained ultimate decision-making discretion over those funds, and he concedes that any use needed approval from the department chair. While his discretionary authority was reduced and eliminated, Dr. Agrawal does not allege that his salary as a tenured faculty member was affected by those decisions. Montemagno's proposed discipline that was never implemented does not infringe his property rights; and in any event, Dr. Agrawal exercised his rights to a due process hearing to challenge those proposals through the CBA's grievance procedures.

Dr. Agrawal asserts that all of the actions taken against him affected his property rights, his reputation, and his "campus presence." (Doc. 90 at 101) He relies on <u>Gunasekera v. Irwin</u>, 551 F.3d 461 (6th Cir. 2009), which he suggests settled in his

favor the question of whether the Defendants infringed his property rights.  In that case, a professor's graduate faculty status was suspended for three years by the University Provost and plaintiff's Dean, following their public announcement of a plagiarism investigation report that criticized the professor for ignoring his responsibilities and contributing to academic misconduct.  Plaintiff was not given a pre- **or** post-deprivation hearing or opportunity to challenge those allegations or his suspension.  Defendants moved to dismiss his subsequent Section 1983 complaint, arguing that he lacked a protected property interest in his graduate faculty appointment.  The Sixth Circuit rejected that argument, relying on plaintiff's allegations that the university had a usual and common practice of allowing appointed graduate faculty members to remain in that status so long as they satisfied four generally objective criteria, and defendants did not dispute that the plaintiff satisfied those criteria.  The university admitted that there was no precedent for revoking graduate faculty status because plaintiff's was the first such incident.  Plaintiff also alleged a tangible economic loss (a partial summer salary) resulting from the suspension.  These allegations were sufficient to withstand dismissal under Rule 12(b)(6).

Here, at the summary judgment stage, Dr. Agrawal must do more than rely on the allegations of his complaint.  No hearing was required for most of the actions of which he complains.  He was afforded hearings under the CBA to challenge the proposed disciplinary measures, and he was successful in avoiding most of those proposals.  Dr. Agrawal's tenure and his salary were never disrupted by the Defendants' actions.  He suggests that his reputation or his "campus presence" were affected in some way.  There is nothing in the record suggesting that any of the investigations or

actions taken against Dr. Agrawal were made public, a situation that might affect his liberty interest and could entitle him to a "name-clearing" hearing.  In <u>Gunasekera</u>, the Sixth Circuit also held that the plaintiff had a protected liberty interest in his reputation that was infringed by Defendants' public announcement, in a publicized press conference, of his alleged involvement in the plagiarism scheme.  Plaintiff had demanded a public name-clearing hearing which had been denied.  The court held that the university must offer him a hearing "that is adequately publicized to address the stigma the university inflicted on him."  <u>Id</u>. at 471.  Here, there is no suggestion that the accusations or investigations into Dr. Agrawal's conduct were made public; and he has not shown how any of the actions substantially affected his "campus presence" such that any protected property interest might have been infringed.

V.    <u>Substantive Due Process</u>

Dr. Agrawal also alleges that Defendants violated his substantive due process rights.  He argues that Defendants not only deprived him of his property rights, but interfered with his rights to academic freedom and equal protection, conduct that he argues "shocks the conscience."  He claims that due to the temporary grant restrictions, "[h]is existing grants were terminated. His graduate research program, for which he was hired, came to a standstill."  (Doc. 90 at 102)  He accuses Defendants of intentionally trying to destroy him, of conducting sham investigations, and engaging in arbitrary and capricious decision-making.  (<u>Id</u>. at 106-108)

A substantive due process claim can arise from (1) a violation of an established constitutional right, or (2) behavior that "shocks the conscience."  The Sixth Circuit has held:

-56-

The interests protected by substantive due process are of course much narrower than those protected by procedural due process.  Most property interests warranting the protection of procedural due process, for instance, may be substantively modified or abolished by the legislature. ... Interests protected by substantive due process, which the legislature may **not** infringe unless supported by sufficiently important state interests, include those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that "shock the conscience," ... and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental.

Bell v. Ohio State Univ., 351 F.3d 240, 249-250 (6th Cir. 2003)(internal citations omitted, emphasis in original).

Dr. Agrawal argues that Defendants violated his right to academic freedom; his complaint alleges that his First Amendment right to "pursue his research and teaching without the chilling effect of interference by the defendants, who apparently developed enmity against him, which took the form of taking his research funding and applying such to other endeavors ...".  (Doc. 7 at 9)  Dr. Agrawal cites no evidence that the substance or content of Dr. Agrawal's research and teaching - which he describes as "mesh net communications," or computer enhanced microwave communication networks (Doc. 90 at 113, n. 559) - led to any infringement of his First Amendment right to speak or write about academic issues or his research.  Moreover, as Defendants note, the right to "academic freedom" generally enures to a public university or college, not to an individual teacher with respect to disputes with the administration over educational policy or discipline.  See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist., 624 F.3d 332, 344 (6th Cir. 2010), quoting Borden v. Sch. Dist., 523 F.3d 153, 172 n.14 (3d. Cir. 2008).

The Court has already concluded that the Defendants did not violate Dr.

Agrawal's equal protection rights by discriminating against him. Absent an explicit constitutional violation, there is no violation of the substantive due process clause. In Bell v. Ohio State Univ., 351 F.3d 240 (6th Cir. 2003), a former medical student claimed that the university discriminated against her and violated her equal protection rights when it terminated her medical school enrollment. The Sixth Circuit held: "Where, as we explain below, there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process. ... Certainly the contention that the medical college's actions were arbitrary or capricious cannot be sufficient; otherwise judicial review for compliance with substantive due process would become the equivalent of a typical state or federal Administrative Procedure Act." Id. at 251 (internal citation omitted).

Dr. Agrawal cites Gutzweiler v. Fenik, 860 F.2d 1317 (6th Cir. 1990), where the Sixth Circuit affirmed a jury's verdict that the defendants intentionally discriminated against the plaintiff, a female professor who was denied tenure based on her sex. The court held that the tenure decision constituted "an arbitrary and capricious deprivation of the individual's liberty interest in not being terminated from governmental employment for a constitutionally impermissible purpose." Id. at 1329. The court explained that the substantive due process violation flowed entirely from the jury's finding of sex discrimination. But here, as in Bell v. Ohio State, the Court has already concluded that Dr. Agrawal's discrimination/equal protection claim lacks merit, and his substantive due process claim also fails for that reason.

Dr. Agrawal also cites Ciechon v. Chicago, 686 F.2d 511 (7th Cir. 1982), to argue that the Defendants' "sham" investigations violated his substantive due process rights.

-58-

There, a city paramedic was abruptly terminated and successfully brought a Section 1983 claim, alleging that her rights were violated by the city's incomplete and biased investigation.  The facts described by the court distinguish that case from Dr. Agrawal's claims.  The paramedic and her colleagues were called to a home during a blizzard, after a man's family called 911 because he had been shoveling snow and was short of breath.  When the paramedics arrived, the man was calm and sitting at a table, and told them he had suffered a collapsed lung a year before.  The paramedic refused his request for oxygen, as she had been taught not to use supplemental oxygen on patients with a history of unexplained collapsed lung.  She and her colleague urged the man to go to the hospital but he refused.  She explained to his family that she could not force him to go and why she could not administer oxygen.  After the paramedics left, the man's wife called 911 again asking the ambulance to return, but by the time they returned the man had died.

The family complained to the Mayor's office and to local media, claiming that the paramedics did nothing to assist them and refused to take the man to the hospital.  After a brief investigation and several interviews with the family, the female paramedic was suspended, charged with dereliction of duty and discharged, but no charges were filed against the male paramedic who was with her during the conversations with the family, or any other crew members present that night.  The court of appeals affirmed a summary judgment granted to plaintiff, concluding that "the official investigation was single-mindedly and intentionally directed to ruining the career of one, but only one, of the four employees involved in this unfortunate incident."  The court also concluded that the entire investigation and disciplinary process reflected "the City's panic under

pressure from the media and a vengeance-seeking family, leading to the decision to discharge one paramedic to defuse the situation." Id. at 517-518.

Nothing in the record in this case comes close to suggesting that either of the Article 9 investigations were intentionally directed at ruining Dr. Agrawal's career, or that he was unfairly singled out for arbitrary discipline. Nor do the facts support Dr. Agrawal's accusations that Defendants' involvement in the investigations is tantamount to arbitrary and capricious conduct. Even if some of the proposed discipline could be considered "arbitrary" (for instance, Montemagno's proposal that Dr. Agrawal's title be taken away, a proposal he later retracted), that is insufficient to support a substantive due process claim.

The Court also rejects Dr. Agrawal's contention that Defendants' conduct "shocks the conscience." That sort of conduct requires facts suggesting the abuse of official power that is "so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Webb v. McCullough, 828 F.2d 1151, 1158 (6th Cir. 1987). In Webb, the challenged conduct involved a school principal who was chaperoning a student trip to Hawaii. On suspicion that the plaintiff and her roommates had alcohol, he entered their room and searched it; no alcohol was found, but later in the evening a hotel security officer found a boy on the balcony of an unoccupied room adjacent to plaintiff's room. The principal told plaintiff and her roommates to pack their bags because they were going home early. After plaintiff locked herself in the bathroom, the principal tried to break the lock, and then slammed into the door until it gave way, knocking plaintiff against the wall. He grabbed

-60-

plaintiff, threw her against the wall and slapped her.  Plaintiff and her roommates were

dropped off alone at the local airport with stand-by tickets, and did not arrive home for

36 hours.  The Sixth Circuit vacated the summary judgment granted to the principal,

finding that a jury could reasonably conclude that his  conduct was "a brutal and

inhumane abuse of [the principal's] official power, literally shocking to the conscience."

Id. at 1159.  See also, Lillard v. Shelby County Bd. Of Educ., 76 F.3d 716, 725-726 (6th

Cir 1996), finding no substantive due process claim arising from a teacher's unwanted

touching of a female student, even though the conduct was "wholly inappropriate, and, if

proved, should have serious disciplinary consequences" for the teacher.

Dr. Agrawal's hyperbolic accusations aside, the facts in the record do not reflect

any similar abuse of power by either of the Defendants that was "inspired by malice"

such that their conduct "shocks the conscience."  The Court concludes that Defendants

are entitled to judgment on Dr. Agrawal's substantive due process claim.

VI.    Qualified Immunity

Alternatively, Defendants contend that they are entitled to qualified immunity from

Dr. Agrawal's claims.  To determine if Defendants are entitled to this defense, the Court

must inquire whether (1) Defendants violated any of Dr. Agrawal's constitutional rights,

and if so, (2) was that right clearly established at the time of their conduct.  Saucier v.

Katz, 533 U.S. 194, 201 (2001).  The Court has discretion to decide which of these two

issues to analyze first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).   Once the

defense is raised, it is plaintiff's burden to show that the official is not entitled to

immunity by offering sufficient evidence that "what the official allegedly did was

objectively unreasonable in light of the clearly established constitutional rights."

<u>Feathers v. Aey</u>, 319 F.3d 843, 848 (6th Cir. 2003)(internal quotation and citation omitted).

The Court has already found that Defendants did not violate any of Dr. Agrawal's constitutional rights.  Even if some basis might exist in this case for an equal protection or due process claim, the Court would conclude that the right was not clearly established.  There is no clearly established constitutional guarantee to a specific office space or laboratory space, or to control state funding that is itself subject to the state's discretion.  Dr. Agrawal cites <u>Keyishian v. Board of Regents</u>, 385 U.S. 589 (1967) for the proposition that "academic freedom" is a clearly established constitutional right. That case was a challenge to New York State's anti-subversive laws, which provided that a faculty member's "treasonable or seditious" utterances were grounds for dismissal.  The Supreme Court found that the laws were unconstitutionally vague; in so holding, the Court noted that "academic freedom" is a special concern of the First Amendment, "which does not tolerate laws that cast a pall of orthodoxy over the classroom."  <u>Id</u>. at 603.  This case does not clearly establish Dr. Agrawal's "right" to be free of any and all discipline or investigations by UC and the Defendants, especially when those actions are prompted by third-party complaints (Xie) and by Dr. Agrawal's own testimony.  And as previously noted, there is nothing in the record suggesting that the content of Dr. Agrawal's research and teaching prompted any of the Defendants' actions such that his First Amendment rights were infringed.   If any of Dr. Agrawal's constitutional rights were implicated by Defendants' conduct, the Court would conclude that they are both entitled to qualified immunity.

**CONCLUSION**

-62-

For all of the foregoing reasons, the Court grants Defendants' motion for summary judgment (Doc. 84).  The parties' motions for leave to exceed page limitations (Docs. 65 and 89) are also granted.

Plaintiff's claims against Defendants Carlo Montemagno and John Bryan are hereby dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: October 7, 2013          s/Sandra S. Beckwith
                                Sandra S. Beckwith
                                Senior United States District Judge